## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT McHENRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 07-1360 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Robert McHenry and Defendant Michael J. Astrue, Commissioner of Social Security.  Plaintiff seeks review of the final decision by the Commissioner denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  For the reasons discussed below, Defendant's motion is denied and Plaintiff's motion is granted insofar as he seeks remand for further consideration by the Commissioner.

## II.   BACKGROUND

### A.    Factual Background

Plaintiff Robert McHenry was born on October 1, 1965; he dropped out of school in the ninth grade and did not receive a GED. Between 1980 and 1994, he worked at a variety of jobs and in 1995,

1

he completed vocational training as a plumber's assistant. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 6, "Tr.," at 59.) He then worked regularly in that profession until 1999 when he ceased all employment for a year, apparently because of "stress" and an injury to his knee suffered on the job. (Tr. 315; 38.) In 2001 and 2002, he worked part-time as a cook for a fast food chain. According to Mr. McHenry, he left that job following a verbal altercation with his supervisor. (Tr. 318; 186.)

While he was unemployed, Mr. McHenry cared for his elderly parents who had many physical problems and for an equally elderly neighbor. In April 2004 he was involved in a serious argument with his sister which resulted his arrest for assault and public drunkenness, a ten-day period in jail, and being required to complete 100 hours of community service. (Tr. 320-321.) He was also directed to attend weekly Alcoholic Anonymous ("AA") meetings and undergo mental health treatment. He began treating with Dr. Balakrishna R. Ragoor, a family practitioner, on May 3, 2004. (Tr. 185; 74.) Dr. Ragoor diagnosed Plaintiff with major depression and generalized anxiety disorder with panic attacks. (Tr. 205.)

B.    Procedural Background

On January 21, 2005, Mr. McHenry applied for Social Security benefits, claiming his disability began December 31, 2002, due to depression. He stated in his application that as of January

2

2000, he was no longer able to motivate himself to work or perform work-related tasks due to his constant depression. (Tr. 56.) When his application for DIB was denied (Tr. 30-33), Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ.")

On November 28, 2006, a hearing was held before the Honorable Michael F. Colligan at which Plaintiff was represented by counsel. Judge Colligan issued his decision on March 28, 2007, again denying benefits. (Tr. 10-21.) The Social Security Appeals Council declined to review the ALJ's decision on August 10, 2007, finding no reason pursuant to its rules to do so. (Tr. 3-5.) Therefore, the March 28, 2007 opinion became the final decision of the Commissioner for purposes of review. 42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), *citing* Sims v. Apfel, 530 U.S. 103, 107 (2000). Plaintiff filed suit in this Court on October 9, 2007, seeking judicial review of the ALJ's decision.

C. Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

3

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact. 42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been
described as requiring more than a "mere scintilla" of evidence,
that is, equivalent to "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Richardson, id.
at 401. "A single piece of evidence will not satisfy the
substantiality test if the [ALJ] ignores, or fails to resolve a
conflict, created by countervailing evidence." Kent v. Schweiker,
710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake *de novo* review of the decision
and does not re-weigh the evidence presented to the Commissioner.
Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006),
*citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d
Cir. 1986) (the substantial evidence standard is deferential,
including deference to inferences drawn from the facts if they, in
turn, are supported by substantial evidence.) If the decision is
supported by substantial evidence, the Court must affirm the

4

decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. LEGAL ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for a period of disability and to receive disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[1] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000). A claimant seeking DIB must also show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a); 20 C.F.R. § 404.131(a). The Commissioner does not dispute that Mr. McHenry satisfied the first two non-medical

---

[1] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities." "Gainful work activity" is the kind of work activity usually done for pay or profit.

5

requirements, and the parties agree that Plaintiff's date last insured was December 31, 2005.

To determine a claimant's rights to DIB,[2] the ALJ conducts a formal five-step evaluation:

(1) if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2) if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3) if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4) if the claimant retains sufficient residual functional capacity ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account his RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of

---

[2] The same test is used to determine disability for purposes of receiving either DIB or supplemental security income benefits. Burns v. Barnhart, 312 F.3d 113, 119, n.1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both programs.

performing work which is available in the national economy.[3] Sykes, 228 F.3d at 263.

Following the prescribed analysis, Judge Colligan first concluded that Mr. McHenry had not engaged in substantial gainful activity after December 31, 2002, his alleged disability onset date. (Tr. 15.) Resolving step two in Plaintiff's favor, the ALJ found that Plaintiff's severe[4] impairments included depression, generalized anxiety disorder, antisocial personality disorder, and substance addiction disorder. He further concluded that although Mr. McHenry had undergone knee surgery and had been diagnosed with diverticulitis and a hearing impairment, these conditions were not severe inasmuch as they would have no more than a minimal effect on his ability to work.[5] (Id.) At step three, the ALJ concluded that Plaintiff's impairments, either alone or in combination, did not

---

[3] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147 n.5 (1987).

[4] See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n.5.

[5] In his brief in support of the motion for summary judgment, Plaintiff does not object to this conclusion and the consequent conclusion that he had no exertional limitations. Therefore, Mr. McHenry's physical limitations are not addressed herein.

meet or medically equal any of the criteria in Listing 12.04, affective disorders; 12.06, anxiety-related disorders; 12.08, personality disorders; 12.09, substance addiction disorders, or any of the other impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 16.)

At step four, the ALJ concluded Mr. McHenry had the residual functional capacity to perform work at all exertional levels, but

due to his emotional impairments, the claimant requires simple, routine, and repetitive work instructions, with minimal public contact and a low-stress work environment.

(Tr. 16.)

Judge Colligan further concluded that due to his non-exertional limitations, Mr. McHenry could not perform his past relevant work as a carpet cleaner, plumber's assistant, or fast food cook which the vocational expert ("VE") at the hearing, Sam Edelmann, had described as medium/semi-skilled, medium/unskilled and light/unskilled, respectively. (Tr. 17; *see also* Tr. 323.)

In response to the ALJ's hypothetical questions at the hearing, Mr. Edelmann testified there were numerous unskilled jobs which an individual of Mr. McHenry's education, experience, and non-exertional limitations could perform in the local or national economy; he provided the examples of stock clerk, office cleaner and hotel/motel cleaner. (Tr. 20; *see also* Tr. 323.) Based on

8

Plaintiff's status as a younger individual[6] with a limited education, a history of work which did not provide transferrable skills, the medical evidence of record, and the testimony of Plaintiff and the VE, the ALJ determined at step five that Mr. McHenry was not disabled and, consequently, not entitled to benefits. (Tr. 20-21.)

## B.   Plaintiff's Arguments

Plaintiff raises two arguments in the brief in support of his motion for summary judgment. First, he notes that although the ALJ acknowledged that Global Assessment of Functioning ("GAF") scores[7] were an important indicator of a claimant's mental health, he relied only on those scores which supported his conclusion that Plaintiff's impairments were not so severe as to preclude any form of work, while at the same time ignoring multiple lower scores which revealed a significant limitation in his ability to function. (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 9, "Plf.'s Brief," at 7-13.)   Second, as a result of

---

[6]   Plaintiff was 37 years old on his alleged disability onset date and 41 at the time of the hearing, making him a "younger" person according to Social Security regulations.   20 C.F.R. §§ 404.1563(c) and 416.963(c).

[7]   The GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves.   Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n.2 (D. Del. Apr. 18, 2002).   Neither Social Security regulations nor case law requires an ALJ to determine a claimant's disability based solely on a GAF score.   See Ramos v. Barnhart, CA No. 06-1457, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

9

this error, the hypothetical question posed to the Vocational Expert did not include all of Plaintiff's limitations and therefore the VE's testimony cannot be considered substantial evidence on which to base the denial of benefits. (Id. at 14-15.) Because we find the ALJ's analysis of the medical evidence regarding Mr. McHenry's mental limitations beyond meaningful review, we need not address Plaintiff's second argument and will remand for further explanation.

C.    Summary of the Mental Health Medical Evidence

1.    *Dr. Ragoor:*  As noted above, following a physical assault on his sister in April 2004, Plaintiff was required to undergo mental health treatment. His initial treatment with Dr. Ragoor was apparently the first regular mental health treatment he had received.

Dr. Ragoor noted on May 20, 2004, that Mr. McHenry complained of anxiety throughout the day although his feelings of hopelessness were "much better" following psychotropic medication. In June 2004, Plaintiff reported he was forgetful, more anxious and still irritable, with poor concentration, although his sleep quality had improved. Dr. Ragoor concluded that although Mr. McHenry was still depressed, his mood was "much improved." (Tr. 204.) Plaintiff reported in September that he was attending AA meetings and receiving treatment at Allegheny East Mental Health Center ("Allegheny East") for anxiety and anger management; his depression

10

was "a lot better" although he was still anxious. (Tr. 203.) In October, he reported he was "doing well on [his] current medications" and had no emotional outbursts, his anger was "very much in control," and his mood "much better." (Tr. 202.) Dr. Ragoor noted on January 21, 2005, shortly after Plaintiff's mother died the previous November, that he showed depressed mood with flat affect. (Tr. 201.)

On February 24, 2005, Dr. Ragoor completed a psychological evaluation for Mr. McHenry. (Tr. 74-78.) In it, he indicated Plaintiff's diagnoses of major depression and anxiety, that at the most recent medical appointment, Mr. McHenry had been well dressed and well groomed, his speech was fluent, stream of thought and abstract thinking were normal, behavior was appropriate and pleasant, psychomotor activity was normal, and store of information and intelligence were good. He was oriented in time, place and person, with good social judgment and good remote and recent memory; he had no hallucinations, illusions, depersonalization, derealization, or disturbed mentation. However, Dr. Ragoor also noted occasional irritability, depressed mood, flat affect, impaired concentration, poor immediate retention and recall, poor impulse control, and slightly poor insight. He further noted episodes of anger and panic attacks approximately 20 times a month during which he could not remember details or directions. (Tr. 74-76.) Although Plaintiff could perform activities of daily living

without difficulty, he experienced difficulties in social functioning as demonstrated by the altercation with his family members in April 2004 and with mental health workers at Allegheny East in November or December 2004. Dr. Ragoor commented that Plaintiff had "partly responded to effexor and zyprexa, but could not fill up meds recently [as a result of] poor finances. So he quit. This made him relapse into depression, excessive anxiety leading to panic attacks." (Tr. 77.)

Dr. Ragoor also completed a document in which he concluded that due to "excessive anxiety to the point of panic," Plaintiff showed marked limitations[8] in his ability to understand, remember and carry out detailed instructions as well marked limitations in his ability to make judgments on simple work-related decisions; he would have slight difficulty understanding, remembering, and carrying out short-simple instructions. He also indicated Mr. McHenry would have marked difficulty interacting appropriately with supervisors in a work setting and responding appropriately to usual work setting pressures or to changes in the work setting; he would have moderate difficulties responding to co-workers and slight difficulty interacting appropriately with the public. Dr. Ragoor commented that Plaintiff had "difficulty in structured settings. Sometimes his anger [and] emotional lability comes in the way of

---

[8] The scale on which Dr. Ragoor was asked to evaluate Mr. McHenry's limitations in this portion of his report included none, slight, moderate, marked and extreme. These terms are not defined in the document. (Tr. 79-80.)

12

dealing effectively [with the] general public. He has difficulty dealing [with] supervisor's direction." (Tr. 79.) While Plaintiff had the capability to do simple tasks, he "forgets details, leaves his task unfinished," effects Dr. Ragoor concluded "could be [a] hindrance at a work situation." Dr. Ragoor noted while Plaintiff had "remote problems" with alcohol abuse, he had been sober since June 2004 and was attending AA meetings regularly; before the episode with his sister, he had been sober for 24 years. (Tr. 80.)

According to Dr. Ragoor's office notes, Plaintiff's mood, anxiety and sleep continued to improve through March 2005 (Tr. 199), but on April 21, 2005, Dr. Ragoor noted that, apparently due to a combination of medication changes and a number of physical problems, Plaintiff was demonstrating increased withdrawal, poor short term memory, fair judgment, and flat affect, although his mood was again described as "much improved." (Tr. 198.)

Dr. Ragoor ordered a CAT scan of Plaintiff's brain and a neurological consultation with Dr. Guy R. Corsello on April 27, 2005. This examination first noted Plaintiff's chief complaint as panic attacks and headaches which were much improved with his current medications. He also reported having experienced fatigue, numbness in his left hand going back to 1995 when he was examined by another neurologist, and occasional tingling in his legs. The neurological examination revealed that Mr. McHenry was alert and oriented times three with normal recent and remote memory, good

13

attention span and concentration, normal language function and good fund of knowledge. A CT scan was within normal limits and Dr. Corsello concluded no further follow-up was necessary. (Tr. 112-113.)

Dr. Ragoor continued to treat Plaintiff for a variety of physical illnesses as well as to prescribe his psychotropic medications through at least November 7, 2006.

2. *Allegheny East Mental Health Center:* In addition to Dr. Ragoor's treatment, Plaintiff underwent an initial assessment at the Allegheny East Mental Health Center on August 24, 2004. (Tr. 167-192.) Mr. McHenry described himself in that interview as "retired" and engaged in "ongoing volunteer work." (Tr. 167.) He reported that he did not have any side effects from his current medications, effexor XR, lorazepam, seroquel and wellbutrin XR. (Tr. 169, 173-182.) He also told the therapist who was conducting the interview that since childhood, he was easily agitated and overwhelmed. He also reported anxiety symptoms of restlessness, "feeling keyed up at times," with difficulty concentrating, irritability, and muscle tension. His intermittent depressive symptoms included lack of interest in any activities. All his symptoms were described as mild at the present time. (Tr. 170-171.)

Mr. McHenry reported no current drug use, but admitted he was currently using alcohol and that he had begun drinking when he was

14

a teenager. He also expressed concern about his level of alcohol usage and reported a history of disruptive interpersonal interactions and legal issues partly related to that problem. (Tr. 172; 188-189.) He explained he had left his last job due to verbal conflicts with his supervisor and had left previous jobs for the same reason. (Tr. 186.)

In the therapist's mental assessment examination, he described Mr. McHenry as having limited concentration, i.e., he was "distractable;" he demonstrated "poverty of thought," his dress was "sloppy;" his emotional expression was "blunt" and restricted." He demonstrated "thought blocking," poor insight and judgment, irritable behavior during the interview, poor immediate and recent memory, and anxious mood. On the other hand, his intellect and abstract thought were considered normal, as was his motor activity, orientation, perceptions, consciousness, speech and waiting room behavior. The therapist concluded there was a potential for violence although Plaintiff denied suicidal or homicidal thoughts. (Tr. 187-188.)

The therapist's diagnosis, later confirmed by a medical doctor, was acute adjustment disorder with mixed disturbance of emotions and conduct; alcohol abuse, and cocaine abuse;[9]

---

[9]    It is unclear why the therapist arrived at the diagnosis of cocaine abuse since all other indications in the record point to prior use of marijuana as a teenager. (See, e.g., Tr. 191, 138.) Mr. McHenry did not report current cocaine use in this interview and later reported that he had used cocaine only in 1979-1980, although "conflicting stories" about cocaine abuse were noted. [continued]

personality disorder not otherwise specified ("NOS"); and a current GAF score of 51.[10] (Tr. 190; 192.) He agreed to receive individual outpatient therapy every two to four weeks and to meet with a psychiatrist to address his problems with anger, irritability, depression, anxiety and alcohol abuse. (Tr. 191; 166.)

On October 13, 2004, Mr. McHenry was re-evaluated by a medical doctor, Ashok Jain. Dr. Jain diagnosed Plaintiff with recurrent severe major depressive disorder with psychotic features, impulse control disorder NOS, alcohol dependence disorder, and antisocial personality disorder; his current GAF was 50.[11] (Tr. 137-141.) During that session, Plaintiff also reported having been hospitalized for mental problems, i.e., "being distraught" three or years before (i.e., approximately 2000-2001) and was thereafter admitted to another hospital for mental health treatment related to possible suicidal ideation. (Tr. 137.) Dr. Jain noted Mr. McHenry

_____

(Tr. 138-139.) Mr. McHenry also stated in an interview at Allegheny East on November 17, 2004, that he "does not and has never used cocaine in his life, [and] is upset that this was stated by someone here." (Tr. 135.)

[10] A GAF rating between 51 and 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." See the on-line version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Multiaxial Assessment, American Psychiatric Association (2002), at www.lexis.com., last visited July 31, 2008 ("Online DSM-IV.")

[11] A GAF score of 50 is indicative of serious limitations in the individual's overall level of functioning, e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting; or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Online DSM-IV.

16

was "very uncooperative on account of his guarding and defensiveness. I had the impression that he was deliberately [with]holding information in fear of maligning himself. He is also being manipulative during interview." (Tr. 139.) He later concluded,

> This patient has strong resistence toward any [therapy] and has very limited insight into his illness as well as only legal coercion to come to this facility henceforth his chances of improvement are very limited. Furthermore his chances of repeating his past behaviors are high as he don't [sic] see any internal reason to change it. Prognosis is guarded to poor.

(Tr. 140.)

Although Plaintiff reported feeling "overwhelmed" after the death of his mother in November 2004, he experienced less anger and irritability while coping with numerous stressors; he also reported the ability to deal with legal requirements and to productively take care of his parents. He denied using alcohol or marijuana since the initial session and there were no indications of such use. (Tr. 160.) In late May 2005, Dr. Jain left Allegheny East and Dr. Patricia Passeltiner became Plaintiff's treating physician. She did not amend Dr. Jain's diagnoses of November 2004 until June 16, 2006, when she retained the psychiatric descriptions but raised his GAF score to 60,[12] indicative of "moderate symptoms (e.g., flat

---

[12] The page containing the June 16, 2006 diagnosis is missing from the record. (*See* Tr. 117-118, which does not contain the customary third page including the diagnosis and electronic signature of the physician. (*Compare* Tr. 119-121.) We conclude the diagnosis was changed on June 16, 2006, based on information included in the report of August 11, 2006, particularly Tr. 116. However, Dr.

17

affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers.)"

3. *Evaluation by State Agency Medical Staff:* On March 15, 2005, a state agency psychologist, Douglas Schiller, Ph.D., performed a file review[13] of Mr. McHenry's medical records to date and completed a Residual Functional Capacity Assessment - Mental. (Tr. 96-98.) He concluded Plaintiff was no more than moderately limited in any aspect of his understanding and memory, ability to sustain concentration and persistence, social interactions, and adaptation to the normal work setting.

In the explanation of his findings, Dr. Schiller noted that the evidence established the medically determinable impairments of major depressive disorder, generalized anxiety disorder, antisocial personality disorder and polysubstance dependence. He noted no impairment of memory function, the ability to "carry out very short and simple instructions," a "functional" ability to perform activities of daily living and maintain social skills, the ability to exercise appropriate judgment in the workplace, and no restrictions with regard to workplace adaptation. Dr. Schiller

Passeltiner's reasons for the change are not included in the record.

[13] Social Security regulations provide that although state agency physicians provide only a review of the medical file and do not personally examine a claimant, administrative law judges "must consider" their opinions inasmuch as those individuals are experts in their fields and are trained in applying the regulations. 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i).

18

further noted that Dr. Ragoor's "opinions are consistent with the residual functional capacity determined in this decision," and adopted his statements regarding the ability to make occupational and performance adjustments. However, he found Dr. Ragoor's comments about Plaintiff's ability to make personal and social adjustments were "not consistent with the medical and non-medical evidence," noting in particular, the fact that Mr. McHenry "had only a brief treating relationship" with Dr. Ragoor. Therefore, giving Dr. Ragoor's report "appropriate weight," Dr. Schiller concluded Plaintiff would be "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairments." (Tr. 98.)

Dr. Schiller also completed a Psychiatric Review Technique Form, noting the same diagnoses as above. (Tr. 99-111.) He concluded Plaintiff had no functional limitations in his activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had experienced no repeated episodes of decompensation of an extended duration.

D.   The ALJ's Analysis of the Medical Evidence

In his decision, the ALJ summarized Dr. Ragoor's report of February 24, 2005, commenting that Plaintiff received treatment every two months for medication refills and follow-up. He accurately noted Dr. Ragoor's comments regarding Plaintiff's mental

19

status exam and his indication that Plaintiff demonstrated marked limitations in his abilities to handle detailed instructions, make work-related decision, interact with supervisors and respond appropriately to pressures and changes in the work setting. He further noted that "it is unclear whether these assessments were related to the claimant's non-compliance" with his prescribed medications. (Tr. 18.) The results of the neurological examination by Dr. Corsello were accurately summarized and the ALJ referred to Dr. Ragoor's progress notes on Plaintiff's physical condition through November 7, 2006, but did not refer to his notes regarding Plaintiff's mental condition for the period. (Tr. 19.)

The ALJ also noted the reports from Allegheny East, referring specifically to the August 31, 2005 report which described Plaintiff's symptoms at that times as "restless mood, 'feeling keyed up,' with concentration lapses, but to a 'mild degree." (Tr. 18.) He further noted Plaintiff's diagnoses and his GAF score of 50. (Id.) Later in his decision, the ALJ commented on reports from Allegheny East, in particular those "with recent GAF scores of 60, indicating mild symptoms of depression." (Tr. 19.)

In summary, the ALJ concluded:

While the record supports some of the claimant's complaints, there are no findings to support the extent of his disabling allegations. No treating or consulting source indicates that the claimant is unable to perform at least some work activities. The record indicates no significant work precluding exertional or emotional limitations. The claimant's history of substance addiction has abated, with one reported exception, and

20

the records show that the claimant's symptoms are controlled with compliance. The claimant's prior work record is insufficient to support an inference of disability from the fact that he was not working full-time.[14] I find that the claimant is less than fully credible however, in giving the claimant the benefit of the doubt I shall factor in some of the claimant's reported functional limitations into his RFC.

. . . . Most treatment notes are indicative of mild to moderate functional restrictions. Notwithstanding claimant's assertions that he cannot work, I find that most health professionals, who had treated or examined him, or have just reviewed the file are generally consistent in their opinions that he has a moderate impairment.

(Tr. 19.)

E. Discussion

Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, e.g., a one-time consultative examiner.[15]

---

[14] The Court is unable to determine the meaning of this sentence since it is clear from the record, that when he was working as a plumber's assistant from 1995 to 1999, Mr. McHenry earned in excess of $20,000 a year, which would seem to imply full-time work.

[15] No psychiatric consultative examination was apparently ordered in this case. In light of the conflict between Dr. Ragoor's opinions of Plaintiff's limitations and the notes from Allegheny East which reflect a lesser degree of impairment as well as Dr. Schiller's opinion, we suggest that on remand, the ALJ order such an exam.

Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. 20 C.F.R. § 416.902.

The regulations also carefully set out the manner in which opinions from the various medical sources will be evaluated. 20 C.F.R. § 416.927. In general, every medical opinion received is considered. Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.) 20 C.F.R. § 416.927; see also Adorno v. Shalala, 40 F.3d 43, 47-48 (3d Cir. 1994) ("greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant" and the least weight given to opinions of non-examining physicians.) The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically

22

acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 416.927(c)and 404.1527(d)(2).

The overwhelming problem the Court faces in considering the ALJ's decision herein is the lack of explanation for much of his reasoning. Although he summarizes the evidence accurately for the most part, critical points are overlooked, omitted or mischaracterized. For instance, the ALJ fails to refer to any progress notes from Allegheny East for the period August 24, 2004, through August 31, 2005, or to the fact that the assessment to which he refers was initially prepared by Dr. Jain on October 13, 2004. The fact that for almost a year, Dr. Jain did not modify his conclusion that Plaintiff's impairments were quite severe would seem to imply that Plaintiff's symptoms persisted despite medication and psychotherapy. The ALJ refers to some of Plaintiff's own self-described symptoms and history dating from August 2004, but neglects to mention the therapist's conclusions that he demonstrated limited concentration, poverty of thought, blunt and restricted emotional expression, poor insight and judgment, irritable behavior during the interview, poor immediate and recent memory, anxious mood and a potential for violence. Nor does he mention Dr. Jain's conclusions that Mr. McHenry strongly resisted therapy, had "very limited insight into his illness," and that his prognosis for improvement was "guarded to poor." These

characteristics are consistent with the diagnoses and with the GAF score of 50, yet the ALJ does not explain why he apparently disregarded these factors in arriving at the conclusion that most health professionals who had treated him "are generally consistent in their opinions that he has a moderate impairment."

Similarly, although the ALJ commented about Dr. Ragoor's February 2005 evaluation, he questioned the physician's conclusions that Plaintiff demonstrated marked impairments in several areas, noting it was unclear if those assessments were related to medication non-compliance. We find nothing in Dr. Ragoor's report which relates the two issues; in fact, the comments about temporary non-compliance due to financial difficulties are in an entirely separate section of the report from those about the severity of Plaintiff's limitations. Moreover, the ALJ does not explain how he reconciles Dr. Ragoor's findings of marked limitations with his conclusion that "most treatment notes are indicative of mild to moderate functional restrictions."

As long-term treating physicians, the opinions of Drs. Jain and Ragoor should have been given significant, if not controlling weight. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202 (3d Cir. 2008) ("Under applicable regulations and the law of this Court, opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight" when they are "well-supported by medically acceptable clinical and laboratory

24

diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the claimant's] case record.") (internal quotation and citation omitted.) Here, however, the ALJ fails to indicate what weight, if any, he gave to their reports and why. He appears to rely on the report by Dr. Schiller whose findings - based only on a file review - should have been given relatively little weight according to Social Security regulations.

Moreover, we find the ALJ's reliance on Dr. Schiller's report to have been misplaced because his analysis of the record is far from complete and contains significant errors. For instance, he states: "The claimant became depressed when his mother passed away in 3/04 and he lost his job and custody of his child." The record actually shows that Plaintiff's mother died in November 2004 and that Plaintiff quit his last job sometime in 2002.[16] There is also evidence that Plaintiff had been hospitalized for becoming "distraught" sometime in 2000 or 2001, although no records from that period appear in the record. Thus the implication that Plaintiff's depression was of relatively recent onset and well after his last working date is not supported by the evidence.

Dr. Schiller also commented that in the October 2004 mental status exam, Dr. Jain had noted Plaintiff's "insight and judgment were somewhat limited due to his addition [sic] to alcohol and

---

[16] We are unable to identify the point at which Plaintiff lost custody of his daughter, but his divorce occurred in 1997. (Tr. 185.)

cocaine dependence and his anti-social behavior." (Tr. 111.) The Court finds no such attribution in Dr. Jain's notes. And while Dr. Schiller mentions several positive comments from the October 2004 report, he fails to mention the GAF score of 50 or the "guarded to poor" prognosis.

A similar bias toward positive factors and neglect of those which would support a claim of disability appears in Dr. Schiller's summary of Dr. Ragoor's assessment as well. There is no mention, for instance of Plaintiff's depressed mood, flat affect, poor immediate retention and recall, poor impulse control, anger, rage, frequent panic attacks, lack of social functioning, or marked impairments in work-related activities. Purportedly based on Dr. Ragoor's February 2005 report, Dr. Schiller describes Plaintiff's impaired concentration as "mild," an adjective not used by Dr. Ragoor,[17] and notes "slightly poor" test judgment, another mischaracterization. (Dr. Ragoor did describe Plaintiff's insight as slightly poor.)

The Court has been unable to identify the basis for Dr.

---

[17] We find it disconcerting that Defendant engages in similar mischaracterization. For instance, in his brief, the Commissioner states, "In June of 2006, Plaintiff **complained** about taking care of his ill father and managing the household responsibilities." (Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 11, at 5-6, emphasis added.) According to the record cited by Defendant, the actual statement was, "Robert experiences stress and anxiety over caring for father who is ill, managing household responsibilities and financial concerns." (Tr. 149.) In our view, complaining about these factors is quite different from identifying them as causes of stress and anxiety.

26

Schiller's comment that when he worked, Mr. McHenry "said that he reported to work on time, had good attendance, he was able to keep up with his work, and he was able to concentrate for extended periods of time." This is the type of information which would usually appear in a questionnaire concerning a claimant's activities of daily living, but no such document is included in the record.[18]

Finally, Dr. Schiller stated that Dr. Ragoor's report concerning Plaintiff's ability to make occupational and performance adjustments are "well supported" by the evidence in the file. Dr. noted marked limitations in the ability to interact appropriately with supervisors, respond appropriately to pressures and changes in a routine work setting, factors which logically should be considered occupational adjustments. (Tr. 79.) Yet, Dr. Schiller concluded that Plaintiff had no more than moderate limitations in this area, a description which is inconsistent with a finding that Dr. Ragoor's conclusions are well-supported by the medical evidence. He also noted that Dr. Ragoor's comments about Plaintiff's difficulties in personal and social adjustments (e.g., anger, rage, panic attacks, altercations with family members and

---

[18] The ALJ also appears to have relied on the missing activities questionnaire, citing to a report of February 25, 2005, in which Mr. McHenry reported that he helped care for his father, performed household chores for himself, his father, and his daughter for whom he had regular periodic custody, and was generally unlimited exertionally. In the absence of the report, the Court is unable to verify the accuracy and completeness of the ALJ's summary thereof.

27

mental health workers) are "not consistent with all of the medical and non-medical evidence in the claims folder. (Tr. 98.) But Dr. Ragoor's comments in this regard are entirely consistent with those of the Allegheny East staff (see, e.g., Tr. 185-186), and there is no medical or non-medical evidence to the contrary which we have been able to identify.

Finally, Dr. Schiller commented that Mr. McHenry "had only a brief treating relationship" with Dr. Ragoor and implies that this is one reason he gave Dr. Ragoor's findings "appropriate weight." "Appropriate" is not defined. In fact, Dr. Ragoor had treated Plaintiff on a regular basis for almost a year when he completed his February 2005 report, a period we do not regard as "brief" given that the total period under consideration from beginning of treatment until the hearing before the ALJ was less than three years and that Dr. Ragoor continued to treat Mr. McHenry through at least November 2006. Moreover, the length of the treating relationship is only one factor to be considered in determining the weight given to a physician's opinions.

It has long been established in this Circuit that an ALJ's determination must "be accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli v. Halter, 247 F.3d 34, 41 (3d Cir. 2001). Where there is conflicting evidence, the ALJ must clearly indicate the evidence he rejected and his reason for doing so. Burnett v. Commissioner of SSA, 220

28

F.3d 112, 121 (3d Cir. 2000). While the Third Circuit Court of Appeals does not require an ALJ "to use particular language or adhere to a particular format in conducting his analysis," he must provide sufficient explanation of his findings to permit "meaningful review." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004), quoting Burnett, 220 F.3d at 119. As the Court of Appeals has pointed out, absent such an explanation, the court is "handicapped" because it is "impossible to determine whether the ALJ's finding. . .is supported by substantial evidence." Fargnoli, 247 F.3d at 40; see also Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983) (in the absence of such an explanation, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.)

Here, there was probative evidence in the form of Dr. Ragoor's statements, particularly regarding Plaintiff's marked limitations in relevant areas. The ALJ did not clearly explain why he rejected those assessments, implying only that they may have been related to Mr. McHenry's period of non-compliance with his medication.[19]  The

---

[19]  Defendant argues that "Plaintiff's symptoms were well controlled with psychotropic medications. . .and he experienced a relapse of symptoms only when he ceased taking the same." (Def.'s Brief at 14.) The fact that an individual's symptoms are controlled with medication or that he is stable with medication is not the issue. The relevant inquiry is "whether the claimant's condition prevents him from engaging in substantial gainful activity." Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000). Moreover, the record reflects that Mr. McHenry also experienced relapses when his mother died, when his medications were changed, and when he experienced multiple physical problems, events not related to non-compliance with his medication regime. To the best of the Court's ability to determine, there are no

29

ALJ did not probe into this matter at the hearing, despite the Social Security Administration's policy that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *See* Social Security Ruling 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."[20] In short, we find the ALJ's analysis is "beyond meaningful review" and conclude this case must therefore be remanded for clarification. *See* Burnett, 220 F.3d at 119.

We note for the record that Defendant has offered a number of reasons which support the ALJ's conclusion that Plaintiff's limitations were only mild or moderate. (*See* Defendant's Brief in Support of Motion for Summary Judgment, Docket No. 11, "Def.'s Brief," at 13-14.) We decline to accept this argument for three reasons. First, most of the factors Defendant identifies were not

---

other references to non-compliance in the progress notes from Allegheny East nor elsewhere in Dr. Ragoor's notes.

[20] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984).

overtly relied upon by the ALJ in his decision. The Third Circuit Court of Appeals has long held that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based," and Defendant may not substitute his reasons for those of the ALJ. Fargnoli, 247 F.3d at 44, n.7, *quoting* SEC v. Chenery Corp., 318 U.S. 80, 87 (1943).

Second, many of the cited factors pertain to Mr. McHenry's activities such as caring for his parents and a neighbor, periodically having custody of his daughter, and performing household chores. As one Court of Appeals has pointed out, the fact that a parent takes adequate care of her children may be the result of "heroic efforts" and that providing such care has "a degree of flexibility that work in the workplace does not." Gentle v. Barnhart, 430 F.3d 865, 867-868 (7ᵗʰ Cir. 2005). We find no reason not to apply the same standard when an adult child takes care of his elderly parents. *See also* SSR 85-15: "Capability to Do Other Work — The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments," commenting that "Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day care programs, social work programs and similar assistance. . . . The mentally impaired may cease to function effectively when facing such demands as getting to work

31

regularly, having their performance supervised, and remaining in the workplace for a full day."

Finally, Defendant argues that "the record fails to demonstrate that Plaintiff was functioning at a level that comports with a GAF score of 50 during the relevant period." (Def.'s Brief at 13.) We find this to be an unacceptable attempt by the Defendant to substitute his own analysis for that of medical professionals who treated Plaintiff on a regular basis. See Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (the precept that "an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving mental disability.") Elsewhere, Defendant points out that Dr. Jain's GAF score of 50 "is only one point away from the category that corresponds to moderate symptoms" and that Dr. Passeltiner's assessment of 60 "is only one point away from the category that corresponds to mild symptoms." (Id. at 4 and 6, respectively.) Determination of a GAF score based on the psychological, social, and occupational functioning of an individual is a precise, four-step process to be performed by a qualified medical expert. While it may be true that a score at the top of a range is only "one point away" from a less severe range, the fact that the expert determined that either the individual's overall symptoms or his ability to function fell within one range rather than another should be respected by adjudicators taking this measurement into

consideration. *See* Online DSM-IV, Multiaxial Assessment. We find it outside the scope of our review to question an evaluation made by a medical professional when there is no contemporaneous conflicting evidence from another professional to show Dr. Jain's GAF score was incorrect.

## V.  FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its discretion, affirm, modify or reverse the Secretary's final decision with or without remand for additional hearings. However, the reviewing court may award benefits "only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the plaintiff is disabled and entitled to benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

We agree with Plaintiff that the ALJ failed to adequately explain why he adopted the opinion of the state agency physician regarding the extent of Plaintiff's limitations without explaining why he rejected the opinion of Dr. Ragoor and several months of progress notes from Allegheny East. On the other hand, we do not find such substantial evidence of disability that we are compelled to directly award benefits. Therefore, we remand for further consideration consistent with the matters raised herein, particularly a clarification by the ALJ of the weight given to the

opinions of Plaintiff's treating physicians and his reasons for rejecting certain evidence which would support a finding of disability at any time during the period December 31, 2002, through December 31, 2005. *See* <u>Burnett</u>, 220 F.3d at 120, remanding to ALJ for a discussion of the evidence and an explanation of the reasoning supporting his determination.

An appropriate Order follows.

August ___5___, 2008

William L. Standish
United States District Judge